*282 OPINION OF THE COURT
Chief Judge Breitel.
Petitioner, a tenured teacher, in a CPLR article 78 proceeding, seeks to annul a determination of respondent school district dismissing him on two charges of insubordination (see Education Law, § 3020-a, subd 5). Special Term sustained the first charge, but annulled the second and remanded the matter to the board of education for fixing of a sanction short of dismissal. The Appellate Division modified by reinstating both the second charge and the dismissal, and petitioner appeals.
The preliminary issue is whether the board’s determination, apart from the sanction imposed, is supported by substantial evidence. Assuming it is so supported, also at issue is whether for violating a voluntary agreement not to teach a particular work of fiction and abruptly walking out of a meeting with the school principal, dismissal is a sanction so disproportionate to the offense as to "shock the court’s sense of fairness.”
The order of the Appellate Division should be modified by reversing so much of the order as reinstated the dismissal and otherwise be affirmed. There being substantial, albeit contested, evidence to support each finding of insubordination, to that extent the board’s determination is beyond review (Matter of Pell v Board of Educ., 34 NY2d 222, 230). The dismissal, however, even under the court’s limited review of administratively imposed sanctions, cannot stand. Petitioner’s conduct was isolated, did not involve grave moral turpitude, and worked no grave injury to the school district. The matter should be remitted to Special Term, therefore, with directions to remand to the school district for determination of an appropriate sanction, which may be as restrained as a letter of reprimand but in no event more than one year’s suspension without pay.
Petitioner, a teacher employed in the Mechanicville High School since 1966 and eventually tenured, had for several years taught J. D. Salinger’s "Catcher in the Rye” to his sophomore English class. It is not contradicted that the book had been taught for several years and had not been removed from the school’s curriculum. In the fall of 1973 complaints from parents caused the school superintendent to question the methods employed by petitioner in teaching the novel. Particular exception was taken to his use in the classroom of explicit street language appearing in the book. To resolve the *283 problem, the superintendent and the school principal met with the teacher. According to school officials, and evidenced by a memorandum later circulated by the superintendent, once he was advised of the community reaction to his manner of teaching the novel, the teacher voluntarily agreed to drop the book and find an appropriate substitute. In the fall 1974 semester, however, without warning and despite the earlier understanding, the teacher resumed use of the book.
As a result, on November 25, 1974, the teacher was summoned to a conference in the principal’s office. The meeting ended unexpectedly, however, when, after five minutes, the teacher abruptly walked out. Although the principal pursued him and, in the presence of others, asked him to return, the teacher refused.
Two charges of insubordination were made. The first arose out of the aborted conference, and the second was grounded on violation of the voluntary agreement.
Probable cause having been found by the board of education on both charges, a three-member hearing panel was convened (see Education Law, § 3020-a). Following two days of hearings, the panel recommended that the first charge be dismissed and the second sustained, in each case by a two-to-one vote. The only panel member to recommend a particular sanction suggested that at most a letter of reprimand be included in the teacher’s file.
Despite the panel recommendations, which then were not binding on the board, the board unanimously found petitioner guilty of both charges and resolved that he be dismissed (see former Education Law, § 3020-a, L 1970, ch 717, § 16; compare L 1977, ch 82, in effect since April 15, 1977, under which the board is bound by panel recommendations). This proceeding followed.
With respect to the board’s findings of insubordination, extended discussion is unnecessary. Petitioner, it is true, denies having reached a definitive agreement with respect to teaching the Salinger novel. He also seeks to justify his conduct at the November, 1974 conference with the principal. That the evidence is conflicting, however, is irrelevant. What does matter is that there is substantial evidence in the record that petitioner had agreed to cease teaching the novel and that, without acceptable excuse, he terminated the conference with the principal (see Matter of Pell v Board of Educ., 34 *284 NY2d 222, 230-231, supra). Hence, the board’s determination, apart from the sanction imposed, is beyond review.
Petitioner’s resort to constitutional limitations to avoid the consequences of the board’s findings is of no avail. Petitioner is not charged with teaching an unacceptable work of literature. Nor are his methods the subject of charges. It is not as though petitioner, concerned with academic freedom, firmly stood his ground against community pressure in defense of his classroom activities. Petitioner instead agreed not to teach the Salinger book, and, without notice, reneged on the understanding. Moreover, evidently when about to be called to task for disregarding his prior agreement, he walked out on his superior. The charges are thus simple ones, and attempts to elevate them to constitutional dimensions misperceive their true nature.
The sanction imposed presents another question. Judicial review of administratively imposed sanctions is limited: only when the sanction is, under the circumstances, so disproportionate to the offense as to "shock the conscience of the court” may it be revised (Matter of Pell v Board of Educ., 34 NY2d 222, 232-235, supra). But, that the standard against which such sanctions will be tested leaves the administrative body with great latitude does not mean that disciplinary measures can go unchecked by judicial review.
As it was said in the Pell case (supra, pp 234-235): "Of course, terminology like 'shocking to one’s sense of fairness’ reflects a purely subjective response to the situation presented and is hardly satisfactory. Yet its usage has persisted for many years and through many cases. Obviously, such language reflects difficulty in articulating an objective standard. * * * At this time, it may be ventured that a result is shocking to one’s sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individuals. Additional factors would be the prospect of deterrence of the individual or of others in like situations, and therefore a reasonable prospect of recurrence of derelictions by the individual or persons similarly employed. There is also the element that the sanctions reflect the standards of society to be applied to the offense involved. Thus, for a single illustrative contrast, habit *285 ual lateness or carelessness, resulting in substantial monetary loss, by a lesser employee, will not be as seriously treated as an offense as morally grave as larceny, bribery, sabotage, and the like, although only small sums of money may be involved.”
To be sure, the teacher’s conduct was not a trivial matter. Crediting the administrators’ version, the teacher breached an agreement relied upon by school authorities to quiet parental complaints. Even if innocently motivated by a misguided perception of his responsibilities as a teacher, it was not for petitioner, albeit in an isolated incident, to arrogate the sole power of judgment.
In fairness, however, the teacher’s conduct in context involved neither cardinal moral delinquency nor predatory motive. There is no suggestion that his actions were part of a pattern, or that his conduct involved the "persistent unwillingness to accept the directives of his superiors” which merited dismissal in Matter of Short v Nassau County Civ. Serv. Comm. (45 NY2d 721, decided herewith). Nor did the charges indicate a lack of capacity in general as a teacher, or a grave injury to the school district. It is significant too that the only hearing panel member to recommend a sanction concluded that a letter of administrative reprimand should be the severest measure imposed.
Under the circumstances, dismissal of the tenured teacher is so disproportionate to the offense as to shock the court’s sense of fairness. An appropriate sanction may be as light as that recommended by the hearing panel member or, at most, as severe as one year’s suspension without pay. Since, however, in this case this court will not presume to determine the precise sanction to be imposed, remittal is appropriate (see Matter of Pell v Board of Educ., 34 NY2d 222, 233-234, supra). Particularly is this so because there is here presented a matter involving both internal discipline and an understandable concern for the reactions of parents in the school district, areas in which the board possesses special sensitivity (see Matter of Ahsaf v Nyquist, 37 NY2d 182, 184-185).
Accordingly, the order of the Appellate Division should be modified, without costs, to reverse so much of the order as reinstated the sanction imposed, and otherwise be affirmed, and the matter remitted to Special Term with directions to remand to the school district for determination of an appropriate sanction.
*286 Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified, without costs, and the matter remitted to Special Term with directions to remand to the school district for determination of an appropriate sanction in accordance with the opinion herein and, as so modified, affirmed.